UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSE MEZA,

               Petitioner,

     v.

STU SHERMAN,

               Respondent.

Case No. 18-cv-00599-JD (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Jose Meza, a *pro se* state prisoner, has brought a habeas petition pursuant to 28 U.S.C. § 2254 asserting claims for: (1) instructional errors; (2) Confrontation Clause violations; (3) insufficient evidence to support gang findings; and (4) cumulative error. The Court ordered Respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it and Meza filed a traverse. The petition and a certificate of appealability are denied.

## BACKGROUND

In May 2011, the Santa Cruz County District Attorney filed an information charging Meza and co-defendants Joel Sanchez and Angel Torres with the murder of Richard Campos and active participation in a criminal street gang. The information alleged that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang and that a principal intentionally discharged a firearm in the commission of the offense. 1 Clerk's Transcript ("CT") 1483-89; ECF No. 13-3 at 2-5. In April 2013, a jury found Meza guilty of second-degree murder and gang participation, and found the gang and firearm enhancements to be true. 2 CT at 2639-43;

1 ECF No. 13-4 at 103-07. The jury found co-defendant Sanchez guilty of first-degree murder and

2 gang participation and found true the gang and firearm enhancements. 2 CT at 2644-46, 2648

3 ECF No. 13-4 at 108-10, 112. The jury could not reach a verdict about co-defendant Torres. 2 CT

4 at 2648; ECF No. 13-4 at 112.

5     In September 2013, the trial court sentenced Meza to 40 years to life in prison. Pet. at 2;

6 ECF No. 1 at 2. Meza filed a direct appeal in the California Court of Appeal. Ex. C. In

7 December 2015, the court affirmed the judgment. Ex. F.

8     In January 2016, Meza and Sanchez filed a petition for review in the California Supreme

9 Court. Exs. G, H. The California Supreme Court granted review and remanded the case to the

10 Court of Appeal for reconsideration in light of *People v. Sanchez*, 63 Cal. 4th 665 (2016), which

11 addressed a Confrontation Clause issue involving an expert's case-specific, out-of-court

12 statements. Exs. I, J.[1] The parties filed supplemental briefs in the California Court of Appeal.

13 Exs. K, L. In December 2016, the California Court of Appeal again affirmed the judgment in a

14 written opinion. Ex. M; *People v Sanchez and Meza*, 2016 WL 7052471 (Cal. Ct. App. Dec. 5,

15 2016) (unpublished). Meza field a petition for review in the California Supreme Court, which was

16 denied on March 15, 2017. Ex. O.

17 **STATEMENT OF FACTS**

18     The California Court of Appeal summarized the facts as follows:

19         *A. The Campos Shooting*

20         Richard Campos was 21 years old on September 15, 2009. Campos was affiliated with a Norteño gang, and he had a XIV tattoo on his right forearm as well as other gang tattoos.

21

22         At about 9:45 p.m., Campos was in the driveway of his family's house on Roache Road in Watsonville, talking on a cell phone with

23         Jessica Lopez. Lopez heard a male voice say, "where are you from," and she heard Campos reply that he did not "bang."

24         Witnesses in the neighborhood heard gunshots and called the police, who responded and found Campos dead, near two cars. The cause

25         of Campos's death was a gunshot that hit his neck and transected the carotid artery, apparently from a nine-millimeter bullet. Nine-

26         millimeter bullet casings were found at the scene, and bullet fragments were found in one of the cars.

27

28 [1] The defendant in *People v. Sanchez*, 63 Cal. 4th 665 (2016) is Marcos Arturo Sanchez, not Meza's co-defendant, Joel Sanchez.

On September 17, 2009, two days after Campos's shooting, Watsonville Police Officer Skip Prigge contacted Meza, who was walking with Gonzalez and other Sureño gang members on the street. Officer Prigge took a newspaper from the back pocket of Meza's pants. The front page of the newspaper contained an article about the Campos shooting. Gang members sometimes keep newspaper articles about crimes they have committed as a "badge of honor."

*B. Gang Testimony*

The prosecution presented gang testimony through several witnesses, including Officer Prigge, Officer Juan Trujillo and Sergeant Morgan Chappell. Officer Trujillo had served as a gang enforcement officer for the City of Watsonville, and he had spent his "whole career" investigating gang crimes. Sergeant Chappell's gang experience included working for the Watsonville Police gang unit since January of 2008. He had participated in several hundred gang investigations and over 100 gang arrests during the course of his law enforcement career. He spoke with Watsonville gang members every day on the job. He had spoken with other law enforcement officers regarding gang crimes, and he had reviewed reports of gang crimes.

Watsonville has two main gangs: Norteños, or northerners, and Sureños, or southerners. Sureños identify with the color blue, the number 13, and the word "sur," which is short for southern. Norteños identify with the color red, the number 14, and the Huelga bird. Norteños and Sureños are rivals. Sureños will use the term "Busters" to show disrespect towards Norteños. In Watsonville, the Poorside Watsonville gang is one of the two Sureño subsets.

Sanchez, Meza, Torres, and Gonzalez were members of Poorside Watsonville. Meza's gang moniker was "Little Psycho." Gonzalez's gang moniker was "Grifo." Prior to the Campos shooting, Torres was called "Moco," but afterwards, he was called "Spider." Sanchez's moniker was "Perico." Torres and Sanchez were cousins.

A person can become a member of a gang through a "jump in," during which the prospective gang member is physically assaulted by other gang members. For Sureños, the assault lasts for 13 seconds. To complete the jump-in process, a person must also perform a "jale," which is a gang term meaning "a mission." The jale can be a stabbing, a beating, or a shooting. Officer Trujillo believed that Poorside Watsonville required a person to perform the jale within 72 hours or three weeks of the jump in.

The structure of gangs often includes a person who collects money for the gang and may be referred to as the treasurer, a person who holds the gang's firearms and may be called the sergeant-at-arms, someone who enforces the gang's guidelines, someone who collects the gang dues, and someone who coordinates gang meetings.

According to Sergeant Chappell, the primary activities of Watsonville Sureños are "[s]tabbing, shooting, burglaries, weapons

possessions, group attacks," and similar activities. He defined "primary activity" as "whatever the gang exists to do."

Sergeant Chappell testified about two predicate offenses for the purpose of establishing the "pattern of criminal gang activity" element of section 186.22, subdivisions (e) and (f).

First, Angel Magana, a Poorside Watsonville gang member, was convicted of being a felon in possession of a firearm and being an active participant in a criminal street gang. The convictions were established by certified court records, but Sergeant Chappell had learned about the details of the offenses from the officers who were involved in the investigation and from reading the police reports. The underlying incident had occurred in June of 2009. Magana and another Poorside Watsonville member had been in a vehicle that was searched by police, who found a firearm.

Second, Frederico Contreras, another Poorside Watsonville gang member, was convicted of assault with a deadly weapon and being an active participant in a criminal street gang. Again, the convictions were established by certified court records. Sergeant Chappell had been directly involved in the investigation of the offenses: he had spoken to one of the victims right after the offenses. Contreras and some companions had driven up to the victims and asked, "que varrio," meaning, "What hood are you from." Contreras and some of his companions had gotten out of the car and chased the victims to the police department, then stabbed one of them. Sergeant Chappell came outside and spoke to the victim, who was lying face down on the steps of the police department.

Sergeant Chappell testified that both Magana and Contreras were both active members of Poorside Watsonville at the time they committed the predicate offenses.

*C. Evidence Obtained Via Julian Melgoza*
Poorside Watsonville gang member Julian Melgoza had become a police informant in the spring of 2009, following a probation search of his home that revealed his possession of drug paraphernalia. Melgoza provided the police with information that led to arrests of Poorside Watsonville gang members: one who was a "wanted parolee" and two who were in possession of a firearm.

Based on information provided by Melgoza, police set up a motion-activated camera at a location where members of the Poorside Watsonville gang often met. Meza, Torres, and Gonzalez were among those present at a recorded gang meeting held on May 24, 2009. During a recorded gang meeting held on June 29, 2009, a car was burglarized and then set on fire. After Melgoza was identified as a participant in the vehicle arson, he agreed to further help the police. FN2 He subsequently assisted with two controlled buys of heroin; one was from a Poorside Watsonville gang member.

FN2 Melgoza was ultimately convicted of arson. At the time of trial, he was in custody due to a robbery conviction from an incident in March of 2012.

On September 16, 2009, the day after the Campos shooting, Melgoza contacted Officer Trujillo. Melgoza claimed to have information about the Campos shooting, and he agreed to wear a wire and attend a meeting of the Poorside gang that was held a few days later, at Sanchez's home. Melgoza and Sanchez had a conversation that was recorded and transcribed. FN3

FN3 Two different transcripts of the conversation were prepared for trial, by Officer Trujillo and a defense interpreter.

Sanchez talked about buying guns and about having money from the "hood." He referred to a .38–caliber gun that had been loaned to him and a nine-millimeter gun that had been purchased for around $250.

Sanchez and Melgoza then discussed the Campos shooting. Sanchez referred to Campos as "the victim." Sanchez said that according to the newspaper, Campos had been "talking to the chick on the phone" when "they did something to him." Sanchez referred to "the jale that happened" FN4 and stated that four people had been involved: himself, "Spider" (Torres), "Lil Psycho" (Meza), and "Grifo" (Gonzalez). Sanchez stated, "I drove the car and those guys threw down." Sanchez then clarified that both he and Gonzalez had stayed in the car while the others "went for it." When Melgoza commented, "that's how . . . you do a mission," Sanchez responded that "everything came out really nice." Melgoza asked, "Just the way it should be, man; that's how, homie?" Sanchez responded, "With two homies and it has to be done with two guns, man." Sanchez also noted that Campos had been inside of his car when the group first saw him. He described how he had parked the car, the doors had opened, and "boom."

FN4 The defense interpreter translated this phrase as "seriously, right?"

### D. Testimony of Christian Lopez Ramirez

Christian Lopez Ramirez (hereafter referred to as Lopez) was a member of Poorside Watsonville. He testified at trial pursuant to an immunity agreement, which he entered into after being arrested with Meza for burglary in December of 2009. FN5

FN5 Lopez dropped out of the gang and was placed in protective custody, then placed in the witness relocation program.

When he was active in the Poorside Watsonville gang in 2008, Lopez had been the gang's drug dealer. He would also buy guns for the gang. In September of 2009, Sanchez had "the keys" to the gang, meaning that he collected money from the drug dealer and was "in charge of the whole hood."

Lopez testified about Sureño gang protocol, which included a rule against drive-by shootings. Sureños are required to get out of a car and shoot someone from close range. Another rule requires someone who is jumped into the gang to do a jale ("shoot someone or stab someone") by the time of the next meeting. It was not required that the person be killed, but a killing would bring more

respect. An older gang member must go with the person performing the jale, or the incident has to be reported in the newspaper, in order to "vouch that you did it."

Lopez was present when Meza was jumped into Poorside. Meza wanted to do his jale that day, saying he wanted to go shoot someone, "but nothing happened." Lopez was also present when Sanchez, Meza, Torres, and Gonzalez went to go on the mission that resulted in the Campos shooting. Lopez heard Torres volunteer to go "to show him how it's done."

Lopez spoke to Sanchez after the Campos shooting. Lopez remarked, "you guys got down," and Sanchez replied, "Ya, we got him." Sanchez indicated that he had a conflict with one of Campos's brothers while in high school, that the Campos family was all Norteños, and that Campos had "got what he deserved." Sanchez described how he drove to Roache Road and stayed in the car while Meza and Torres "took care of it."

Lopez also spoke with Torres about the Campos shooting. Torres stated that he had walked up to Campos's car and asked him "Where are you from?" Torres stated that he had shot Campos first, and that he had shot Campos in the face. Meza had been scared, but he had also shot Campos after Torres told him, "Shoot him. Shoot him." Torres said he had used a nine-millimeter, and he showed Sanchez that he was carrying a .22–caliber revolver, saying that it had been used as well.

Lopez also spoke with Meza about the Campos shooting. Lopez congratulated Meza, noting that "he got down," meaning that he had gained Lopez's respect. Meza stated, "ya, ya, we got him."

*E. Testimony of Gonzalez*

Gonzalez testified at trial pursuant to a plea agreement related to his conduct in the Campos shooting. FN6 Gonzalez considered himself a Poorside Watsonville associate; he had never been formally jumped into the gang.

FN6 Gonzalez pleaded guilty to conspiracy to shoot at an occupied vehicle with a gang enhancement, as well as active participation in a criminal street gang.

About a week before the Campos shooting, a gang meeting was held at Sanchez's house. Sanchez, Meza, Torres, and Gonzalez all attended. At the meeting, Sanchez took out a nine-millimeter gun and passed it around. Sanchez said that the gun sometimes jammed up, but that he had test fired it and found that it worked. Torres brought out a .22–caliber revolver at the same meeting. The guns were returned to Sanchez and Torres during the meeting.

After Meza was jumped into Poorside Watsonville, he asked Gonzalez to accompany him on his jale. Meza asked if Gonzalez wanted to go "look for some busters," meaning Norteños. Gonzalez agreed to go with Meza, and Meza came over about 15 minutes later. Meza arrived on a bicycle, carrying a scooter. Meza showed Gonzalez a .22– caliber revolver and said that they were going to go

6

down the street to look for someone and "shoot 'em." When Gonzalez saw the .22–caliber revolver, he recognized it as the one that Torres had at the meeting. Gonzalez said that Meza should have taken the nine-millimeter gun instead.

Meza said he did not take the nine-millimeter because it might jam up on him. Gonzalez knew that the .22–caliber revolver had only five shots in it, and he said that five shots were not enough, but Meza said it would be fine.

Gonzalez and Meza walked around for about 30 minutes, but they did not find any Norteños. They walked back to Gonzalez's house, then rode the bicycle and scooter to Meza's house, where Meza called Sanchez to ask for a ride. Sanchez arrived about 10 minutes later, driving an SUV, with Torres in the front passenger seat. Gonzalez and Torres got into the back of the SUV, and the group drove around looking for Norteños. They saw someone who looked like a Norteño, but Sanchez said "let's not shoot him" because the person was with a girlfriend.

The group then drove to Roache Road, where they saw Campos talking on his cell phone near a car. Meza said that Campos was a "buster" and noted that he had a XIV tattoo on his arm. Sanchez stopped the car three houses away. Gonzalez heard Torres cock a gun. Meza and Torres then got out of the car and walked towards Campos, but they came back, saying that someone else was out there. Meza and Torres got back into the car. Sanchez turned the car around and stopped it on the other side of the street. Meza and Torres again got out of the car and walked towards the place where Campos had been standing. Gonzalez heard gunshots, then saw Meza and Torres running back to the car. After they got in the car, Torres said "that for sure he had shot him in the head." The group then drove to Sanchez's house, where another gang member took the shells out of Meza's revolver.

Gonzalez participated in another gang mission in November of 2009. Gonzalez had been the driver when another gang member shot at a Norteño but missed. Gonzalez pled guilty to assault with a firearm in that case.

When Gonzalez was first contacted by the police regarding his participation in the instant case, he did not want to talk to them. He eventually agreed to talk, but he initially "[m]ade up a story" about driving around trying to buy drugs. He later told the police the truth.

*F. Defense Testimony*

The defense witnesses were Denise Choate, the interpreter who had prepared a second transcription of the Melgoza– Sanchez conversation, her husband Glenn, who had digitally enhanced and cleaned up the recordings of that conversation, and Scott Armstrong, an expert on bullets and bullet fragments who was called by Meza. Armstrong examined some of the bullet fragments found at the scene of the Campos shooting and opined that while there was no question that a nine-millimeter gun was used, some of the bullet fragments might also have been from a .22-caliber gun.

7

None of the defendants testified at trial.

*People v. Sanchez and Meza*, 2016 WL 7052471 at *2-6.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), and the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under §2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). In conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the Court looks to the last reasoned opinion. *See Nunnemaker* at 801-06. In this case the Court looks to the second opinion from the California Court of Appeal, *People v. Sanchez and Meza*, 2016 WL 7052471 (Cal. Ct. App. Dec. 5, 2016) (unpublished).

## DISCUSSION

### I. Jury Instructions

Meza argues the court erred by failing to give certain jury instructions, or by giving instructions that were conflicting and confusing.

### A. Federal Standard

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Id.* at 72. The instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Id.* In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982).

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *Estelle*, 502 U.S. at 72 & n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990); *Waddington v. Sarausad*, 555 U.S. 179, 190-191 (2009) (a due process violation requires ambiguity and a "reasonable likelihood" the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt). A "meager 'possibility'" that the jury misapplied the instruction is not enough. *Kansas v. Carr*, 136 S. Ct. 633, 643 (2016). If an error is found under *Boyde*, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, before granting habeas relief. *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).

### B. Failure to Give Accomplice Instruction About Co-Defendant Sanchez

9

United States District Court
Northern District of California

Meza argues the trial court erred by failing to instruct the jury that Sanchez was an accomplice as a matter of law so that the jury could consider Sanchez's statements about Meza only if they were corroborated by other evidence.

The California Court of Appeal denied this claim by interpreting California Penal Code section 111, which provides:

> A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

> An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

Cal. Penal Code § 1111.

Respondent argues this claim fails because it rests on the interpretation of Penal Code section 1111 and, thus, is a state law claim. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas writ unavailable for violations of state law or for alleged error in interpretation or application of state law). In his traverse, Meza cites his Exhibit 1 as proof that he "gave notice to the state court of said federal constitutional violations." Exhibit 1 is a document filed in the Santa Cruz County Superior Court entitled, "Motion to 'Federalize' and Preserve Objections Under Both the United States and California Constitutions." The document states that due process objections made during the trial should be considered pursuant to the Fifth Amendment and that confrontation or right to present evidence objections should be considered pursuant to the Sixth Amendment. This document is dated February 24, 2013, which was before or during the time Meza's trial was taking place. Even assuming this document "federalized" certain of Meza's state claims on appeal, it does not apply to this claim because Meza does not indicate his attorney objected to the court's failure to include this instruction.

Even if Meza's attorney had made a due process or confrontation clause objection, the claim fails because there is no United States Supreme Court authority requiring the corroboration of accomplice testimony. *See United States v. Augenblick*, 393 U.S. 348, 352 (1969) (procedural due process is not implicated in rules of evidence governing the admission of accomplice

10

testimony). The Ninth Circuit specifically addressed California Penal Code Section 1111 and held, "to the extent that the uncorroborated testimony is not incredible or insubstantial on its face, the rule is not required by the Constitution." *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000). At Meza's trial, Sanchez's "testimony" was presented to the jury in a transcript of a recorded conversation between Sanchez and Melgoza, a police informant, in which they discussed the Campos shooting. Sanchez referred to the "jale" that happened and stated four people had been involved, including himself and Meza. *Sanchez and Meza*, 2016 WL 7052471 at *4. Sanchez also said he had stayed in the car with Gonzales when Meza and Torres "went for it." *Id.* This testimony is not incredible or insubstantial on its face, and therefore, the Constitution is not implicated in its admission. *See also, Harrington v. Nix*, 983 F.2d 872, 874 (8th Cir. 1993) (state laws requiring corroboration do not implicate constitutional concerns in habeas proceedings); *Odle v. Calderon*, 884 F.Supp. 1404, 1418 (N.D. Cal. 1995) (corroboration of accomplice testimony not a federal constitutional requirement).

Habeas relief is denied for this claim.

**C. Accomplice Testimony Instructions**

Meza argues the accomplice testimony instructions were erroneous because they "left it to the jurors to determine whether Sanchez and Torres were accomplices." This is similar to Meza's first claim because he again argues the court should have instructed that Sanchez, and also Torres, were accomplices as a matter of law, so the jury would be required to consider their statements only with corroboration.

The relevant jury instructions provided as follows:

> You have heard evidence that defendant Angel Torres made oral statements before the trial to Jose Gonzales and/or Christian Lopez. You must decide whether he made any such statement in whole or in part.
>
> If you decide that Angel Torres made an oral statement or statements before trial, in reaching a verdict as to defendant Joel Sanchez or defendant Jose Meza, you must first decide whether Angel Torres is an accomplice. A defendant making an out-of-court statement is an accomplice if, one, he personally committed a charged crime or, two, he knew of the criminal purpose of the person who committed a charged crime; and three, he intended to and did in fact aid, facilitate, promote, encourage or instigate the

commission of a charged crime.

An accomplice need not be present when the crime was committed. On the other hand, a person is not an accomplice just because he's present at the scene of the crime even if he knows that a crime will be committed or is being committed and does nothing to stop it.

If you decide that Angel Torres was an accomplice, then you may not convict Joel Sanchez or Jose Meza based on Mr. Torres' out-of-court statement alone. You may use such out-of-court statement or statements of Mr. Torres to convict Joel Sanchez or Jose Meza only if (1) Mr. Torres' out-of-court statement is supported by other evidence that you believe; (2) that supporting evidence is independent of Mr. Torres' out-of-court statement. And, three, that supporting evidence tends to connect Joel Sanchez or Jose Meza to the commission of the charged crime.

Supporting evidence, however, may be slight. It does not need to be enough by itself to prove that a non-declarant defendant is guilty of the charged crime and it does not need to support every fact mentioned by the accomplice defendant in the statement.

On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect a non-declarant defendant to the commission of the crime.

The evidence needed to support the statement of one accomplice defendant cannot be provided by the statement or testimony of another accomplice.

ECF No. 13-21 at 157-59.

The same instructions were given, *mutatis mutandis*, for Sanchez. *See* ECF No. 13-21 at 159-61.

The Court of Appeal denied this claim by distinguishing *People v. Robinson*, 61 Cal. 2d 373 (1964), upon which Meza relied in his state appeals and in this petition. This claim must be denied because this habeas court must accept the state court's interpretation of its own laws. *See Swarthout*, 562 U.S. at 219 (federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law); *see also Little v. Crawford*, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim that state supreme court misapplied state law or departed from its earlier decisions does not provide a ground for habeas relief).

This claim is also denied on the same ground stated above -- there is no Supreme Court authority holding that accomplice testimony must be corroborated. *See Augenblick*, 393 U.S. at 352 (1969) (procedural due process is not implicated in rules of evidence governing the admission

of accomplice testimony).

In addition, the Court of Appeal reasonably held that, if the jury had been told that Torres and Sanchez were accomplices as a matter of law, it would have unfairly prejudiced them by imputing their guilt. *See Sanchez and Meza*, 2016 WL 7052471 at *19. As pointed out by the Court of Appeal, both Sanchez and Mesa denied their involvement in the Campos murder and the jury could not reach a verdict as to Torres. If the jury had been instructed that Torres and Sanchez were accomplices as a matter of law, the determination of their guilt or innocence would have been removed from the jury.

Finally, the purported error did not have a substantial and injurious effect or influence on the jury's verdict because the co-defendants' out-of-court statements implicating Meza were independently corroborated by the newspaper article found in Meza's pocket, expert testimony supporting the gang motivation for the killing, the ballistics evidence found at the crime-scene, and the testimony of Lopez and Gonzalez. Although Lopez and Gonzalez were accomplices as a matter of law, their testimony was corroborated by the independent evidence.

### D. Co-Conspirator Instructions

Meza argues the instructions on co-conspirators' statements were confusing because they allowed the jurors to apply the preponderance standard to all the co-defendants' out-of-court statements, whether in furtherance of a conspiracy or not.

The relevant instructions provided:

> In deciding whether the People have proved any of the defendants committed the crime of murder, you may not consider any statement made out of court by any of the defendants unless the People have proved by a preponderance of the evidence. Preponderance of the evidence its [sic] the one time you'd have a different burden of proof than beyond a reasonable doubt.

> So in deciding whether the People have proved that any of the defendants committed the crime of murder, you may not consider any statement made out of court by any of the defendants unless the People have proved by a preponderance of the evidence that (1) some evidence other than the statement itself establishes that a conspiracy to commit that crime existed when the statement was made. (2) any two of the defendants or any one defendant and Jose Gonzales and/or Christian Lopez were members of and participating in the conspiracy when a defendant made the statement. Three, a defendant made the statement in order to further the goal of the

conspiracy; and, four, the statement was made before or during the time that a defendant was participating in the conspiracy.

A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

You may not consider statements made by a person including a defendant who was not a member of the conspiracy even if the statements help accomplish the goal of the conspiracy. You may not consider statements made after the goal of the conspiracy had been accomplished.

Some of you may be confused by why we're talking about conspiracy. None of the defendants are charged with conspiracy. We give you these instructions so you can evaluate how to use any of the alleged out-of-court statements of the defendants or other alleged conspirators.

ECF No. 13-21 at 165-68.

As pointed out by the Court of Appeal, in his appellate brief, Meza only cited the first paragraph of the instruction. *See* ECF No. 1 at 103. However, when the entirety of the instruction is read, it is clear that the jury could use the preponderance of the evidence standard only to consider statements made in furtherance of the conspiracy and only if the government proved by a preponderance of the evidence the four elements of a conspiracy given in the instruction. *See Estelle*, 502 U.S. at 72 (instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record).

Meza also argues the conspiracy instructions deprived him of due process because they "allowed the jury to determine whether or not Torres and Sanchez were accomplices and to use the uncorroborated accomplice statements to establish the defendants were in a conspiracy with each other." ECF 20 at 33-34 (traverse). However, the jury would have to consider the conspiracy instruction together with the instruction that corroboration was required where any statement of an accomplice tended to incriminate a defendant, or where any statement of a co-defendant was used to convict another co-defendant. *See* ECF No. 13-21 at 161-62 (instructing that jury may rely on co-defendants' statements to convict a defendant only if other evidence showed the charged crime was committed).

Meza has not shown a reasonable likelihood that the jury misapplied the accomplice instructions in a way that violates the Constitution. *See Waddington*, 555 U.S. at 190 (to show due

process violation, defendant must show both ambiguity and a "reasonable likelihood" the jury applied the instruction in a way that violates the Constitution).

### E. Instructions on Sanchez's Statements

Meza argues the instructions on Sanchez's statements to Melgoza allowed the jury to consider them without any requirement of corroboration, even if it found Sanchez was an accomplice.

The relevant instructions provided:

> You have heard evidence that defendant Joel Sanchez made an oral statement and/or statements to Julian Melgoza before the trial. You must decide whether the defendant Joel Sanchez made any such statement or statements in whole or in part.

> If you decide that the defendant Joel Sanchez made such a statement to Julian Melgoza, consider the statement along with all of the other evidence. It is up to you to decide how much importance to give to the statement. Julian Melgoza is not an accomplice as defined in the previous instruction.

> Consider with caution any statement made by a defendant tending to show his guilt unless the statement was written or otherwise recorded.

> A defendant may not be convicted of any crime based on his out-of-court statements and his codefendants [sic] out-of-court statements alone. You may only rely on the defendant's out-of-court statements and his codefendants out-of-court statements to convict him if you conclude that the other evidence shows the charged crime was committed. The other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.

> The identity of the person who committed the crime and the degree of the crime may be proved by the defendants [sic] statements alone. You may not convict a defendant unless the People have proved his guilt beyond a reasonable doubt.

ECF No. 13-21 at 161-62.

Although these instructions did not specify that, if the jury found Sanchez was an accomplice, it could only consider his statements to Melgoza with corroboration, the jury was given other instructions that statements of accomplices required corroboration. When the instructions are viewed as a whole, the jury would know that, if it found Sanchez was an accomplice, it could only consider his statements with corroboration. As stated previously, an

1  instruction cannot be considered in isolation, but must be considered in the context of the

2  instructions as a whole. *See Estelle*, 502 U.S. at 72; *see also Weeks v. Angelone*, 528 U.S. 225,

3  234 (2000) (jury presumed to follow its instructions); *Doe v. Busby*, 661 F.3d 1001, 1017 (9th Cir.

4  2011) (habeas court must presume that jurors follow the jury instructions). Meza has not shown a

5  reasonable likelihood that the jury misapplied this instruction in a way that violates the

6  Constitution.

### F. Instruction on Accomplices

8  Meza argues the jury was confused by the instructions allowing it to determine if Sanchez

9  and Torres were accomplices because it was instructed that Gonzalez and Lopez were accomplices

10  as a matter of law.

11  There was no reasonable likelihood the jury misapplied the accomplice instructions. The

12  jury was aware of, and the instructions reflected that, the case involved the out-of-court statements

13  of three defendants, and the jury was to determine if they were accomplices, and the testimony of

14  Gonzalez and Lopez, who were non-defendant accomplices. There is no evidence that the jury did

15  not follow all of the instructions, as this Court must presume it did. *See Busby*, 661 F.3d at 1017

16  (habeas court must presume jury follows its instructions).

17  As discussed, Sanchez and Torres were defendants and so any instruction that they were

18  accomplices as a matter of law would remove the ultimate determination of their guilt from the

19  jury; on the other hand, Gonzalez and Lopez were not defendants, so the jury was not being asked

20  to determine their guilt or innocence. Given these facts, the Court of Appeal reasonably

21  concluded that the different accomplice instructions were necessary.

### G. Corpus Delicti and Single Witness Instructions

23  Meza argues the corpus delicti (proof of crime) instruction was confusing when read with

24  the instructions on accomplice testimony and single witness testimony.

25  The relevant instructions are as follows:

26          A defendant may not be convicted of any crime based on his out-of-
        court statements and his codefendants out-of-court statements alone.

27          You may only rely on the defendant's out-of-court statements and
        his codefendants [sic] out-of-court statements to convict him if you

28          conclude that the other evidence shows the charged crime was

committed. The other evidence may be slight and need only be
enough to support a reasonable inference that a crime was
committed. The identity of the person who committed the crime and
the degree of the crime may be proved by the defendants [sic]
statements alone. You may not convict a defendant unless the
People have proved his guilt beyond a reasonable doubt.

ECF No. 13-21 at 161-62.

Except for the testimony of Jose Gonzales and Christian Lopez,
which requires supporting evidence and any out-of-court statements
made by any of the defendants to Jose Gonzales and Christian
Lopez, which also requires supporting evidence, the testimony of
only one witness can prove any fact. Before you conclude that the
testimony of one witness proves a fact, you should carefully review
all the evidence.

ECF No. 13-21 at 147.

Meza argues the jury would be confused because it was told corroboration was required for

it to consider the co-defendants' out-of-court statements if the jury found they were accomplices

or if the statements were made to Gonzalez or Lopez, but corroboration was not required if their

statements were made to someone else or if the jury found they were not accomplices. Although

the jury was given many instructions about how to consider the statements of various individuals,

viewing the instructions as a whole, *see Estelle*, 502 U.S. at 72, the jury would have understood

when corroboration was needed, that Meza could not be convicted based on his or his co-

defendants' out-of-court statements alone, and that the testimony of a single witness is sufficient

to prove a fact. The California Court of Appeal denied this claim based on the presumption that

the jury is able to follow its instructions. *See Sanchez and Meza*, WL 7052471, at *21. This is not

an unreasonable application of Supreme Court authority. *See Weeks*, 528 U.S. at 234 (jury

presumed to follow its instructions).

**H. Instruction on Meza's Statements**

Meza argues the instruction on his own statements were confusing and incorrect.

The relevant instruction is as follows:

You have heard evidence that defendant Jose Meza made oral
statements before the trial to Jose Gonzales and/or Christian Lopez.
You must decide whether he in fact made any such statements in
whole or in part. If you decide that Jose Meza made such an oral
statement or statements before trial, in reaching a verdict as to Jose
Meza, consider the statements and consider them subject to the
instructions that I've just give you in number – instruction number

335, which is the statement about viewing the testimony of an accomplice with caution. And view it along with all of the other evidence. It is up to you to decide how much importance to give to the statement or statements. Consider with caution any statement made by a defendant tending to show his guilt unless the statement was written or otherwise recorded.

ECF. No. 13-21 at 155.

Meza argues that this instruction's reference to the accomplice instruction was confusing because the jury would believe it could only consider Meza's statements against himself if they were corroborated which contradicts a jury instruction that a defendant's uncorroborated statements against himself is admissible as an admission against his own interest. However, Meza does not argue that the latter instruction was given to the jury; therefore, his argument is hypothetical and not based on the actual instructions. Viewing the instructions as a whole, the jury would have understood the challenged instruction to mean, if it found Meza was an accomplice, it could not consider his statements to Gonzales or Lopez without corroboration.

As above, the Court of Appeal denied this claim based on the presumption the jury was able to correlate the various instructions on out-of-court statements. *See Sanchez and Meza*, WL 7052471, at *21. This is not an unreasonable application of Supreme Court authority. *See Weeks*, 528 U.S. at 234 (jury presumed to follow its instructions). And Meza is not well situated to argue this instruction was prejudicial to him because it required corroboration of his statements to Gonzales or Lopez before the jury could consider them.

## I. Aiding and Abetting Instructions

Meza joined in Sanchez's claim on the aiding and abetting instructions on direct appeal and in Sanchez's petition for review in the California Supreme Court and includes this claim in his federal petition. Meza argues this claim is relevant to him because both he and Sanchez were charged as an aider and abettor. However, in his closing argument, the prosecutor's theory of the case was that Meza was the perpetrator of the crime because he shot Campos and Sanchez was an aider and abettor because he facilitated the shooting. *See* ECF 13-22 at 35-42 (prosecutor's closing argument on aiding and abetting). Therefore, it is questionable whether a claim challenging the aider and abettor instruction is relevant to Meza. Even so, for the sake of

completeness, the Court will address it.

## 1. Erroneous Instructions

Meza argues the aiding and abetting instructions erroneously stated an aider and abettor could be guilty of first-degree murder so long as the direct perpetrator committed a willful, premeditated, and deliberate murder, instead of requiring the jury to determine "whether each aider and abettor personally acted with malice and a willful, premeditated and deliberated intent to kill." The Court of Appeal reviewed all of the aiding and abetting instructions and determined, "the instructions, together, informed the jury that Sanchez could not be convicted of first-degree murder unless he 'intended to aid and abet' a first-degree murder." *See Sanchez and Meza*, WL 7052471, at *8.[2] The Court concluded, "there is no 'reasonable likelihood that the jury misconstrued or misapplied' the instructions so as to convict Sanchez of first-degree murder without considering his individual state of mind." *Id.*

This claim was argued on the basis of state law and the Court of Appeal analyzed it as such. As a state law claim it is not cognizable on habeas review, s*ee Estelle*, 502 U.S. at 67-68, and a habeas court must defer to the state court's interpretation of its own laws, *see Swarthout*, 562 U.S. at 219 (federal habeas writ unavailable for violations of state law or for alleged error in interpretation or application of state law).

On the merits, the claim also fails. The jury was given the following instructions:

> To prove that a person is guilty of a crime based on aiding and abetting that crime, the People must prove that, one, the direct perpetrator committed the crime. (2) the person knew that the direct perpetrator intended to commit the crime. Three, before or during the commission of the crime the person intended to aid and abet the direct perpetrator in committing the crime; and, four, the person's words or conduct did in fact aid and abet the direct perpetrator's commission of the crime.
>
> Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the direct perpetrator's commission of that crime.

ECF No. 13-21 at 164.

---

[2] Because Meza joined in Sanchez's argument, the Court of Appeal only mentions Sanchez by name.

These instructions, together with the instructions specifying the elements of first- and second-degree murder, explained the required mental state for a person to be found guilty of the crime of murder as an aider and abettor. *See* ECF No. 13-21 at 169-72 (murder instructions). Read together, the instruction told the jury a defendant could not be convicted as an aider and abettor of murder unless he had knowledge of the perpetrator's plan to commit murder and intended to aid in the crime. This meets the California requirement of the mental state of an aider and abettor. *See People v. Beeman*, 35 Cal. 3d 547, 560 (1984) (aider and abettor shares the perpetrator's specific intent when he knows full extent of perpetrator's criminal purpose and gives aid or encouragement with intent of facilitating perpetrator's commission of the crime). Therefore, the Court of Appeal reasonably concluded there was no reasonable likelihood the jury misconstrued the instructions to convict a defendant as an aider and abettor without considering his own mental state. *See Sanchez and Meza*, WL 7052471, at *8

### 2. Failure to Give Instruction

Meza argues the trial court erroneously failed to give a requested instruction that an aider and abettor is not liable for a crime that is not a reasonably foreseeable consequence of the act aided and abetted and that an aider and abettor may be convicted of a lesser crime than the direct perpetrator. The Court of Appeal denied this claim on the ground that the requested instruction was likely to confuse the jury since the case was not prosecuted on a natural and probable consequences theory of aiding and abetting and there was no evidence that Meza intended to aid and abet a lesser offense than homicide. *See Sanchez and Meza*, WL 7052471, at *10.

This conclusion is not contrary to or an unreasonable application of Supreme Court authority. *See Henderson*, 431 U.S. at 155 (omission of an instruction is less likely to be prejudicial than a misstatement of the law). Furthermore, any error did not have a substantial and injurious effect or influence on the jury's verdict because, as stated above, the prosecution's theory was that Meza and Torres, as the shooters, were the direct perpetrators of Campos's murder, and Sanchez, the senior gang member who facilitated the crime, was liable as an aider and abettor. *See* ECF 13-22 at 35-42 (prosecutor's closing argument on aiding and abetting).

## II. Improper Admission of Co-defendants' Statements

Citing *People v. Aranda*, 63 Cal. 2d 518 (1965) and *Bruton v. United States*, 391 U.S. 123 (1968), Meza argues the trial court violated his right to confront witnesses against him by admitting the out-of-court statements of co-defendants Sanchez and Torres implicating him in the murder. The California Court of Appeal concluded *Bruton* did not apply because the co-defendants' statements were non-testimonial. *See See Sanchez and Meza*, WL 7052471, at *16.

## A. Federal Authority

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.* The Confrontation Clause applies to all "testimonial" statements. *Id.* at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51. The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. *Id.* at 50-51.

Hearsay that is not testimonial, "while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006*); see also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (under *Crawford*, "the Confrontation Clause has no application to [nontestimonial] statements and therefore permits their admission even if they lack indicia of reliability."). The "primary purpose" test establishes the boundaries of testimonial evidence. *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015). Under this test, statements are testimonial: (1) "when they result from questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution,' *Davis v. Washington*, 547 U.S. 813, 822 (2006)," and (2) "when written statements are 'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial, *Melendez-Diaz v. Massachussetts*, 557 U.S. 305, 310-11 (2009)." *Lucero v. Holland*, 902

F.3d 979, 989 (9th Cir. 2018). When the primary purpose of taking an out-of-court statement is to create an out-of-court substitute for trial testimony, the statement is testimonial hearsay and *Crawford* applies. *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). When that was not the primary purpose, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.* The primary purpose of a statement is determined objectively. *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1267 (9th Cir. 2013). Thus "'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.'" *Id.* (quoting *Bryant*, 562 U.S. at 360). The testimonial intent of the speaker must be evaluated in context, and part of that context is the questioner's identity. *Lucero*, 902 F.3d at 990 n.5.

In joint criminal trials, the introduction of incriminating out-of-court statements of a co-defendant, violates the defendant's Sixth Amendment right to confront witnesses. *Bruton*, 391 U.S. at 135-36. However, *Crawford*, which was decided after *Bruton*, added a new layer to Sixth Amendment analysis—that co-defendants' rights under the Confrontation Clause apply only to testimonial statements. *Lucero*, 902 F.3d at 984. After *Crawford*, non-testimonial co-defendants' statements are not protected by the Confrontation Clause. *Id.* (every circuit court to consider the issue has held that, after *Crawford*, *Bruton*'s rule applies only to testimonial out-of-court co-defendant statements).

### B. Analysis

At issue are the out-of-court statements by co-defendants Sanchez and Torres implicating Meza in the Campos shooting. Sanchez's statements were admitted through the transcript of his taped conversation with Melgoza, Officer Trujillo's testimony of what was said on the tape, and through the testimony of Lopez. Torres's statements were introduced to the jury through the testimony of Lopez. Melgoza was a Poorside Watsonville gang member who, unbeknownst to Sanchez, had become a police informant. *See Sanchez and Meza*, 2016 WL 7052471, at *3. Lopez was a member of Poorside Watsonville who testified pursuant to an immunity agreement. *Id.* at *4. Because Sanchez and Torres made the statements at issue to fellow gang members to

describe or brag about the shooting, reasonable speakers, in their circumstances, would not have believed their statements would be used at a trial against Meza. *See Rojas-Pedroza*, 716 F.3d at 1267 (testimonial nature of statements judged by objective standard of the intent of a reasonable speaker under the circumstances). Thus, the Court of Appeal reasonably concluded the co-defendants' statements were not testimonial.

Meza argues Sanchez's statements to Melgoza were testimonial because the police had wired Melgoza so that Sanchez's statements could be used at trial. However, the determining factor is the testimonial intent of the speaker, not the listener. *See id.* Although Melgoza was wearing a wire so his conversation with Sanchez could be used at trial, Sanchez was unaware of the wire. Therefore, as far as Sanchez was concerned, he was talking to a gang associate and friend; there is no evidence that Sanchez intended to have his statements used at a trial.

Meza cites cases from other circuits for the proposition that out-of-court statements by a confidential informant to a police officer are testimonial. Meza cites Officer Trujillo's testimony about what Melgoza told him to support his argument that the out-of-court statements of a confidential informant were admitted against him. However, the trial court cautioned the jury that Trujillo's testimony was not to be taken for the truth of the matter, but only for the jury to evaluate Trujillo's opinion about what he heard in the recording. *See* ECF No. 13-10 at 142. Both California and Federal rules of evidence permit testimony by an expert that is otherwise inadmissible to allow the jury to understand the basis of the expert's opinion. *See* Cal Evid. Code § 801; Fed. R. Evid. 703.

Under *Lucero*, 902 F.3d at 984, once the determination is made that the statements by Sanchez and Torres were nontestimonial, the *Bruton* protection against out-of-court co-defendants' statements does not apply. *See Clark v. Murphy*, 331 F.3d 1062, 1070-71 (9th Cir. 2003) (circuit decisions relevant as persuasive authority to determine whether a state court holding is an unreasonable application of Supreme Court precedent or to assess what law is clearly established), *overruled on other grounds in Lockyer v. Andrade*, 538 U.S. 63 (2003); *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 696-97 (9th Cir. 2004) (citing as clearly established Supreme Court authority circuit courts' consistent interpretation of a Supreme Court case).

1    Therefore, the Court of Appeal's conclusion that *Bruton* did not apply to the co-defendants' out-

2    of-court statements because they were nontestimonial is not contrary to or an unreasonable

3    application of Supreme Court authority.

4    **III. Gang Evidence**

5           In his direct appeal and petition for review in the California Supreme Court, Meza joined

6    in the claims raised by co-defendant Sanchez that there was insufficient evidence to prove the

7    "primary activities" element of the gang participation charge and the gang enhancement.  Meza

8    also joined in Sanchez's claim that the gang expert's testimony establishing Poorside

9    Watsonville's pattern of criminal gang activity was inadmissible testimonial hearsay and, thus,

10   violated the Confrontation Clause.  Meza asserts these claims in his federal petition.

11      **A.  Sufficiency of Evidence**

12         **1.  Federal Standards**

       A state prisoner who alleges that the evidence in support of his state conviction is
13   insufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a
     constitutional claim. *Jackson v. Virginia*, 443 U.S. 307, 321 (1979).  Federal habeas courts must
14   look to state law for the substantive elements of the criminal offense, but the minimum amount of
     evidence required by the Due Process Clause to prove the offense is a matter of federal law.
15   *Coleman v. Johnson*, 566 U.S. 650, 655 (2012).  On habeas review, evidence is sufficient to
     support a conviction when, viewed in the light most favorable to the prosecution, "any rational
16   trier of fact could have found the essential elements of the crime beyond a reasonable doubt."
     *Jackson*, 443 U.S. at 319.  The habeas court must presume the trier of fact resolved any conflict in
17   the evidence in favor of the prosecution and must defer to that resolution.  *Id.* at 326.

       *Jackson* claims face a high bar in federal habeas proceedings because they are subject to
18   two layers of deference.  *Johnson*, 566 U.S. at 651; *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th
     Cir. 2005).  First, the state courts are required to view the evidence in the light most favorable to
19   the prosecution and ask whether any rational trier of fact could have found the elements of the
     crime beyond a reasonable doubt.  *Kyzar v. Ryan*, 780 F.3d 940, 949 (9th Cir. 2015).  Second,
20   under AEDPA, habeas relief is warranted only if the state courts unreasonably applied the already
     deferential *Jackson* standard.  *Id.*  "The only question under *Jackson* is whether the finding was so
21   insupportable as to fall below the threshold of bare rationality."  *Johnson*, 566 U.S. at 656.

22         **2.  "Primary Activities"**

23      The Court of Appeal noted the following about this claim:

24            The trial court instructed the jury that in order to find that Poorside
              Watsonville was a criminal street gang, it had to find that the
25            primary activities of the gang were the commission of assault with a
              deadly weapon or felon in possession of a firearm, both of which are
26            enumerated offenses in section 186.22, subdivision (e).  Sanchez
              [and Meza] contend the evidence was insufficient to establish that
27            committing those crimes was a primary activity of Poorside
              Watsonville.

28

*Sanchez and Meza*, WL 7052471, at *11.

California Criminal Code § 186.22 (Participation in Criminal Street Gang) states, in relevant part:

> Any person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years.
>
> . . . any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further or assist in any criminal conduct by gang members, . . . [specifies punishment]
>
> . . .
>
> As used in this chapter, "pattern of criminal gang activity" means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons.
>
> . . .
>
> As used in this chapter, "criminal street gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity.

Cal. Crim Code §§186.22 (a), (b), (e) and (f).

The Court of Appeal held that, under *People v. Martinez*, 158 Cal. App. 4th 1324, 1330 (2008), Sergeant Chappell's testimony provided substantial evidence that Poorside Watsonville's primary activities were the commission of assault with a deadly weapon or felon in possession of a firearm, as provided in the trial court's instructions. *Sanchez and Meza*, WL 7052471, at *12.

Sergeant Chappell testified that he had: (1) participated in several hundred gang investigations and over 100 gang arrests; (2) personally interacted with gang members and communicated with other law enforcement officers about gang crimes; (3) written at least 50

warrants having to do with gang activities; and (4) testified as a qualified gang expert 46 times. *See* ECF No. 13-18 at 25-26. Based upon his experience, the court determined Sergeant Chappell was qualified to be an expert witness and, thus, could render opinion testimony in addition to testimony based on his personal knowledge. *Id.* at 28.

Sergeant Chappell then testified that he was familiar with Watsonville Poorside as well as the Sureno gang, the larger organization Watsonville Poorside was affiliated with. *Id.* at 28-46 (describing specific attributes of Sureno gang and Watsonville Poorside).

Concerning patterns of criminal activities for the Surenos, Sergeant Chappell testified they are stabbings, shootings, burglaries, weapons possessions and similar group activities. *Id.* at 46. Concerning predicate offenses, Sergeant Chappell testified about two crimes—(1) weapons possession and (2) stabbing while being an active participant in a criminal street gang—that were committed in the past by other members of Poorside Watsonville. *Id.* at 46-47; 54-55. The felon-in-possession conviction was authenticated by the certified court record of the conviction and the stabbing conviction was authenticated by Sergeant Chappell's testimony about his personal investigation of this offense and the certified court record of the conviction. *Id.* at 53, 55-56.

Under the deferential *Jackson* standard and viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found it established the primary activities of Poorside Watsonville beyond a reasonable doubt.

### 3. Confrontation Clause Claim

Meza argues his right to confront witnesses against him was violated by the admission of Sergeant Chappell's testimonial hearsay to establish Poorside Watsonville engaged in a "pattern of criminal activity." The Court of Appeal denied this claim, holding that the certified court records of the convictions were not testimonial and that Sergeant Chappell's testimony establishing the stabbing incident was not hearsay because it was based on his personal knowledge from investigating the crime and speaking to the victim while the victim was under the stress of excitement from the incident. *Sanchez and Meza*, 2016 WL 7052471, at *13-14.

As stated above, the Confrontation Clause only applies to "testimonial" statements. *Crawford*, 541 U.S. at 50-51. The court records of the convictions of Poorside Watsonville

members for weapons possession and assault with a deadly weapon were not testimonial because their primary purpose was to memorialize the two convictions, not for the purpose of being used as evidence in Meza's criminal trial. *See Lucero*, 902 F.3d at 989 (explaining primary purpose test). Sergeant Chappell's testimony about the stabbing conviction was based on the following: (1) he was one of the first people who arrived at the scene of the stabbing incident, which occurred on the front steps of the police department; (2) he contacted the victim who gave Sergeant Chappell the description of the people who stabbed him and the vehicle they were in; and (3) he relayed this information to other officers. *See* ECF No. 13-18 at 56. This testimony, based on Sergeant Chappell's personal knowledge, was not hearsay. Because Sergeant Chappell testified at the trial and was subject to cross-examination by Meza's counsel, the Confrontation Clause was not implicated. The Court of Appeal's denial of this claim was not contrary to or an unreasonable application of Supreme Court authority.

## IV. Cumulative Effect

Meza argues the cumulative effect of the alleged constitutional errors violated his right to a fair trial. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Similarly, there can be no cumulative error when there has not been more than one error. *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

In this case, there were no constitutional errors and, therefore, nothing can accumulate to the level of a constitutional violation.

**CERTIFICATE OF APPEALABLITY**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a

substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Meza has made no showing warranting a certificate and so none is granted.

## CONCLUSION

The Court orders as follows:

Meza's petition for a writ of habeas corpus is denied and a writ of appealability will not issue. The Clerk shall enter a separate judgment and close the file.

**IT IS SO ORDERED.**

Dated: March 14, 2019

_____
JAMES DONATO
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSE MEZA,

              Plaintiff,

      v.

STU SHERMAN,

            Defendant.

Case No.  18-cv-00599-JD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 14, 2019, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jose  Meza ID: AR6374
Cal. Substance Abuse Treatment Facility
P.O. Box 5246
Corcoran, CA 93212

Dated: March 14, 2019

Susan Y. Soong
Clerk, United States District Court

By:
LISA R. CLARK, Deputy Clerk to the
Honorable JAMES DONATO